Louis Joseph **ABBATE**, Michael Louis Falcone, Charles G. Perry and James Shelby, Appellants,

v.

**UNITED STATES** of America, Appellee.

No. 16226.

United States Court of Appeals Fifth Circuit.

Aug. 8, 1957.

Rehearing Denied Sept. 9, 1957.

Charles A. Bellows, Chicago, Ill., Frank F. Mize, Forest, Miss., Quitman Ross, Laurel, Miss., and Jason Ernest Bellows, Chicago, Ill., for appellants, Louis Joseph Abbate and Michael Louis Falcone.

Robert E. Hauberg, U. S. Atty., Richard T. Watson, Asst. U. S. Atty., Jackson, Miss., for appellee.

Before RIVES, JONES, and BROWN, Circuit Judges.

RIVES, Circuit Judge.

The four appellants were jointly indicted for conspiring[1] to commit the of-

fense denounced by 18 U.S.C.A. § 1362,[2] that is, willfully or maliciously to injure or destroy means of communication operated or controlled by the United States. The overt acts charged extended over a period of ten days, from April 19 to April 28, 1955. A strike was then going on by the Communication Workers of America, CIO, against the Southern Bell Telephone and Telegraph Company.[3]

The defendants Shelby and Perry were officers of the Communication Workers of America, Shelby being an assistant to a vice-president stationed in Washington, D. C. and Perry being President of the Jackson, Mississippi local of that union. Abbate and Falcone were residents of Chicago, Illinois. Norman D. McLeod, also named in the indictment as a co-conspirator but not indicted, was on parole from the Oklahoma State Penitentiary where he had been serving a sentence for armed robbery. He turned state's evidence and was the first and perhaps the principal witness for the Government.

Prior to arraignment, Shelby and Perry filed a joint motion for a severance and separate trial, setting out that Abbate and Falcone had been convicted in the Criminal Court of Cook County, Illinois[4] for a crime based upon the identical acts charged in this case, and that, subsequent to their arrests in Illinois, Falcone and Abbate had made lengthy confessions and statements implicating Shelby in the alleged conspiracy. Their motion for severance was overruled.

1. In violation of the general conspiracy statute covering a conspiracy "to commit any offense against the United States." 18 U.S.C.A. § 371.

2. "§ 1362. *Communication lines, stations or systems*

"Whoever willfully or maliciously injures or destroys any of the works, property, or material of any radio, telegraph, telephone, or cable, line, station, or system, or other means of communication, operated or controlled by the United States, whether constructed or in process of construction, or willfully or maliciously

interferes in any way with the working or use of any such line, or system, or willfully or maliciously obstructs, hinders, or delays the transmission of any communication over any such line, or system, shall be fined not more than $1,000 or imprisoned not more than three years, or both."

3. According to the testimony, the strike began about March 14 and continued until about May 20, 1955.

4. In their pre-sentence hearing it was brought out that they pleaded guilty and received sentences of three months.

McLeod's testimony consumes nearly 200 pages of the typed record. He testified in detail to the formation of the conspiracy and to the acts of each of the conspirators. If believed by the jury, his testimony sufficed for the conviction of all four defendants. Its credibility, however, was severely attacked, not only because of its inherent weakness as the testimony of a co-conspirator, but also because of his conviction of grand theft in California and of armed robbery in Oklahoma. Further, McLeod admitted to a long career of criminal dynamiting, and had refused to testify for the Government until assured by one of the attorneys for the telephone company that "he would see to it" that McLeod was not indicted for conspiracy, and, apparently, that promise had been kept. The Government, therefore, made every effort to corroborate McLeod's testimony.

The taxicab driver who had transported McLeod from Canton, Mississippi to Jackson, Mississippi was produced, as was the Chicago bartender in whose tavern the conspiracy had been hatched. Abbate was the only conspirator other than McLeod whom the bartender could definitely identify. The Government then introduced an investigator for the Illinois Bell Telephone Company and a detective attached to the Chicago Police Department, who testified at great length concerning the statements and admissions of Abbate which did corroborate McLeod in many particulars, including operation sheets and maps showing details of the planned criminal dynamiting. Over the strenuous objections of Shelby and Perry, the testimony as to Abbate's statements and confessions was admitted for the time being as against all four defendants, with the court stating,

"After its over, I shall tell the jury as to how to weigh the evidence. It's incomplete at this time. The case is incomplete and I, myself, I am not fully informed to instruct the jury."

This testimony was received about the middle of the week-long trial.

The Government continued to present a most impressive case. It introduced experts to prove that the Government operated and controlled many of the telephone circuits planned for destruction. It showed by former co-workers of Shelby and of Perry that they had worked on Government circuits and were familiar with their operation and control. It proved Shelby's transportation to Chicago and his registration at a hotel there under an assumed name. It proved by a stenographer that she had retyped the operation plans at the instance of Abbate and Falcone. It proved by two young women residents of Jackson, Mississippi, that, at Perry's request, one of them had accompanied McLeod on a tour of inspection to familiarize himself with the installations to be dynamited, the young woman posing as his wife to allay suspicion in the event they were questioned. As an impressive closing witness, the Government introduced Frank Furlic, Esquire, Assistant State Attorney of Chicago, Illinois, who had interviewed Abbate and Falcone. The court again declined a mistrial and separate trial as to Shelby and Perry, and declined to limit the consideration of Abbate's and Falcone's statements to the one making the statements, stating that "* * * when it comes time to charge the jury, then, I will tell them what the law is."

At four fifteen on Friday afternoon, the last day of the trial, the court commenced its lengthy (more than forty typed pages) charge to the jury. When that charge had been more than half completed, the court finally got around to instructing the jury as follows:

"Now, as to these two men, when they were arrested by the officers and were placed in prison, they no longer had any power to commit acts or to do things that might bind the others and for that reason, while I had some question in my mind at first, a careful examination of the law has convinced me that I should charge you that insofar as their statements to the police officers up

there are concerned, and to the extent that they may involve anybody else, it is not to be considered against the other person. In other words it can be considered against them alone and it can, even though they were out of the conspiracy that evidence is admissible against them for the purpose of proving that they were parties to the conspiracy. In other words, they can make admissions insofar as they are concerned and it is receivable in evidence to be received along with all the other evidence to determine whether they were parties to the conspiracy."

█ It is not necessary now to rule on whether the district court abused its discretion in overruling the joint motion of Shelby and Perry for a trial separate from that of Abbate and Falcone,[5] for upon the plainest of principles it is clear that the judgments of conviction against them must be reversed. At the time of their statements, Abbate and Falcone were no longer parties to the conspiracy. Permitting their statements to be received in evidence against Shelby and Perry was error which could not be cured by the mild admonition contained in the court's final charge to the jury.[6]

█ As against Abbate and Falcone, the case is different. They undertook to withdraw from the conspiracy and to secure a bid of some six thousand dollars from the telephone company for the maps and operation plans. They had themselves, however, already committed overt acts and had dispatched McLeod on his mission of criminal destruction. Their crime was then complete,[7] and their subsequent withdrawal could be considered only in the fixing of their punishment.

█ While the conspiracy was in progress, Abbate and Falcone were bound by the knowledge of Shelby and Perry that many of the circuits to be destroyed were operated and controlled by the Government. Further, the jury could well find that they conspired to stop all communications over any of the cables or facilities regardless of who operated or controlled the circuits, and were bound by what would have been the natural consequences of their conspiracy.[8]

█ The destruction by dynamite of some of the facilities near Jackson, Mississippi occurred on April 28, two days after Abbate and Falcone had been arrested in Chicago. Such acts, however, stand upon a different footing from declarations of co-conspirators, and were relevant as additional proof of the conspiracy.[9] The facilities destroyed were. among those included in the criminal plans. Shelby and Perry were still at large, and the jury could reasonably infer that they were still acting pursuant to the conspiracy.

█ There was ample evidence from which the jury could have found that, though the facilities were owned by the telephone company, many of the circuits were under full time operation and control by the Government, and that the telephone company could not even

5. See Schaffer v. United States, 5 Cir., 1955, 221 F.2d 17, 19.

6. Delli Paoli v. United States, 1957, 352 U.S. 232, 77 S.Ct. 294, 1 L.Ed.2d 278; Lutwak v. United States, 1953, 344 U.S. 604, 617, 618, 73 S.Ct. 481, 97 L.Ed. 593; Krulewitch v. United States, 1949, 336 U.S. 440, 443, 69 S.Ct. 716, 93 L.Ed. 790; Fiswick v. United States, 1946, 329 U.S. 211, 217, 67 S.Ct. 224, 91 L.Ed. 196; Scarborough v. United States, 5 Cir., 1956, 232 F.2d 412, 415.

7. See United States v. Britton, 1883, 108 U.S. 199, 2 S.Ct. 531, 27 L.Ed. 698; United States v. Beck, 7 Cir., 1941, 118 F.2d 178; Eldredge v. United States, 10 Cir., 1932, 62 F.2d 449.

8. See Pereira v. United States, 1954, 347 U.S. 1, 74 S.Ct. 358, 98 L.Ed. 435; Clark v. United States, 5 Cir., 1954, 213 F.2d 63, 65; Williams v. United States, 5 Cir., 1923, 295 F. 302, 305; United States v. Anderson, 7 Cir., 1939, 101 F. 2d 325, 330.

9. Lutwak v. United States, 1953, 344 U.S. 604, 617, 73 S.Ct. 481, 97 L.Ed. 593; Eldredge v. United States, 10 Cir., 1932, 62 F.2d 449, 451.

**414**

make repairs on such circuits without first obtaining the Government's permission. The statute, 18 U.S.C.A. § 1362, Footnote 2, supra, does not require that the Government own the lines or means of communication, but only that they be "operated or controlled by the United States." At least six witnesses testified to facts from which the jury could find such operation or control. Since that issue was so strongly controverted, we find no reversible error in admitting the testimony of the two Army officers stressing the importance of the lines of communication to the National defense.

As to Abbate and Falcone, the judgments are affirmed, and as to Shelby and Perry, the judgments are reversed and the cases remanded.

Affirmed in part and reversed and remanded in part.