STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. WILBERT SINCLAIR, DEFENDANT-APPELLANT.

Argued April 20, 1970—Decided September 29, 1970.

58

*Mr. Richard Newman,* Deputy Public Defender, argued the cause for defendant-appellant (*Mr. Stanley C. Van Ness,* Public Defender, attorney; *Mr. Richard Newman* on the brief).

*Mr. M. Richard Altman,* Assistant Prosecutor, argued the cause for plaintiff-respondent (*Mr. Joseph P. Lordi,* Prosecutor of Essex County, attorney; *Mr. M. Richard Altman* on the brief).

The opinion of the court was delivered by

PROCTOR, J. Wilbert Sinclair was found guilty by a jury of first degree murder on two indictments, one for the murder of Esther Friedman and the other for the murder of Shep Binyard. The jury did not recommend life imprisonment and he was sentenced to death on both convictions. He appeals to this Court under *R. R.* 1:2–1(c) (now *R.* 2:2–1(a)(3)). Previously Sinclair had been jointly tried with Jesse Edward Wilson who had also been indicted for the same crimes, and both men were convicted and sentenced to death. This Court reversed those convictions because of the trial court's failure to instruct the jury on the possibility of returning a verdict of second degree murder. 49 *N. J.* 525 (1967). At our suggestion (*Id.* at 550) the defendants were retried separately, and it is from the conviction in Sinclair's separate trial that he now appeals.

At the trial evidence regarding the shootings was virtually the same as that presented in *State v. Wilson*, 57 *N. J.* 39 (1970) decided today. The main prosecution witness was again Abraham Friedman, the husband of one of the two murder victims, Esther Friedman. He testified that at about 8:30 P.M. on October 24, 1964, he and Esther were working in his liquor store in Newark. One customer, Shep Binyard, was in the store when two men, later identified by Friedman as Wilson and Sinclair, entered the store. Wilson attempted to sit down on a chair but fell off. Binyard offered to help Wilson, but Wilson refused the aid and picked himself up. Friedman believed Wilson was intoxicated and refused to sell liquor to Sinclair. Sinclair then drew a pistol and announced a "stick up." Mrs. Friedman told the men to "take whatever you want but just leave us alone."

Sinclair then directed Wilson to go behind the counter to the cash register. At that time Binyard approached Sinclair and said, "Why don't you leave these nice people alone." Thereupon Sinclair shot him. Mrs. Friedman screamed and began to run outside, but before she could escape Sinclair shot her and ran out of the store. Both shootings were fatal. Friedman, seeing Wilson at the cash register alone, picked up a bottle of whiskey and struck Wilson over the head with it. Friedman then retreated to the rear of the store to reach the burglar alarm in the refrigerator. Wilson attempted to follow him, but was threatened by Friedman with the broken neck of the bottle and ran out of the store. Friedman sounded the alarm and went to the aid of his wife who was lying on the sidewalk outside the store.

Friedman further testified that about an hour later that evening, he was taken by the police to Newark City Hospital where he identified Wilson who was sitting with other men in the emergency room. Shortly thereafter at the police station, Friedman identified photographs of both Wilson and Sinclair from a number of photographs shown to him. As

he was leaving the interrogation room, he spotted Sinclair in an adjoining room and identified him to the police as "the man who killed my wife." Finally, on the stand Friedman unequivocally stated that the man he identified that night was the defendant Sinclair.

Over objection, the State also introduced corroborating evidence of Wilson's involvement in the crimes. Officers Patterson and Lebo testified that at 8:45 P.M. in response to a general alarm they proceeded to the vicinity of the crimes where they saw a man staggering on the street and bleeding from the head. They drove the man, who was later identified as Wilson, to the Newark City Hospital. At the hospital slivers of glass were removed from Wilson's head and clothing. Expert testimony later revealed that these slivers were part of the liquor bottle Friedman used to strike the intruder at the cash register.

The State also introduced evidence regarding Sinclair's apprehension and arrest. After Friedman had identified Sinclair's photograph, the police went to Sinclair's apartment but found no one there. Upon leaving the apartment, the police spotted Sinclair walking on 12th Avenue. They shouted for him to halt, but he quickened his pace and was pursued into a parking lot. There he threw an object under a parked car. The object was identified by the police as a .38 caliber revolver. Expert evidence was later introduced showing that the bullet fatal to Mrs. Friedman was fired from the gun, and that the bullet fatal to Binyard was probably fired from the gun. Sinclair was searched at the scene of his arrest and the police found several .38 caliber bullets.

Sinclair was the principal defense witness. On direct examination he admitted that he had a record of prior convictions for atrocious assault and battery and carnal abuse. He also admitted that he knew Wilson and had been with him on the night of the shootings. According to Sinclair, he and Wilson were in a bar that night and Wilson left the bar with a tall dark-skinned man. He, Sinclair, re-

mained at the bar where he talked with a Mary Wells. About fifteen minutes later, Wilson returned to the side door of the bar, bleeding from the head. He told Sinclair that he had been in a fight with three men and asked Sinclair to keep the gun and ammunition for him until the next morning. Sinclair admitted that he threw the gun away just before his arrest, but said he did so because he knew it was illegal to possess a dangerous weapon. However, on cross examination he was unable to explain why he did not similarly dispose of an illegal knife that the police found in his possession at the time of his arrest.

Sinclair's sister testified that she had unsuccessfully attempted to locate Mary Wells, her brother's alleged companion at the time of the shootings. On rebuttal a police officer testified that after a thorough search it was his opinion that Mary Wells did not exist.

The defense also produced testimony by a police officer and a newspaper reporter in an effort to show that Friedman was emotionally upset, and might have been mistaken in his identification of Sinclair shortly after the killings.

On this appeal, Sinclair urges several trial errors and violations of his constitutional rights. We will consider them in the order raised.

I

Sinclair first urges that the State's use of evidence pertaining to his prior convictions infringed upon his constitutional right to a fair trial. Defendant's prior convictions were first brought out by his own counsel on direct examination. According to his brief, counsel took this step in order to lessen the impact of these convictions upon the jury since the State had the statutory right to bring them out on cross examination to attack his credibility (*N. J. S. A.* 2A:81–12; see *State v. Hawthorne,* 49 *N. J.* 130 (1967)). On cross examination the State referred to the convictions brought out on the direct examination and showed more

fully the dates and sentences of the prior convictions. Additionally, the State referred to these convictions in its summation to the jury.

Defendant concedes that, by statute, the State may use prior conviction evidence in order to affect the credibility of an accused where the accused takes the stand. *N. J. S. A.* 2A:81–12, *supra.* He may also be interrogated regarding the number of previous convictions and the duration of the sentences. *State v. Merra,* 103 *N. J. L.* 361 (E. & A. 1927) ; *State v. Nagy,* 27 *N. J. Super.* 1 (App. Div. 1953). And there is no doubt that the State may refer to the prior convictions in summation as long as it limits its references to the credibility of the accused. See *State v. Wade,* 40 *N. J.* 27, 39 (1963). Defendant contends that in the present case the State overstepped the bounds and used the evidence to show that the defendant had a criminal disposition. We disagree. In its summation, the State was careful to point out to the jury that the prior conviction evidence could only be considered as affecting the defendant's credibility. Nor do we believe that the State dwelt too heavily on the point. Credibility was a most important issue in the case since Sinclair's story was so completely at odds with Friedman's version of the murders. Moreover, the trial court carefully instructed the jury on the limited use of such evidence. We reject defendant's contentions regarding the futility of limiting instructions. Although there are areas in which it has been held that limiting instructions are insufficient to overcome prejudice to the accused, see *e. g., Bruton v. United States,* 391 *U. S.* 123, 88 *S. Ct.* 1620, 20 *L. Ed.* 2d 476 (1968) ; *State v. Young,* 46 *N. J.* 152 (1965), the defendant has cited no case and we have found none which holds that a limiting instruction on the use of prior conviction evidence is *per se* insufficient. *Cf. Spencer v. Texas,* 385 *U. S.* 554, 87 *S. Ct.* 648, 17 *L. Ed.* 2d 606 (1967) ; *compare dictum* in *Weaver v. United States,* 133 *U. S. App. D. C.* 66, 408 *F.* 2d 1269, 1273 (1969), *cert.*

*denied,* 395 *U. S.* 927, 89 *S. Ct.* 1785, 23 *L. Ed.* 2d 245 (1969).

Defendant also contends that the use of the prior conviction evidence denied him due process of law because there "is no rational connection between truth telling and specific prior criminal conduct." It is true that if there were no rational connection between prior convictions and credibility, the defendant's due process rights would be violated. See *Tot v. United States,* 319 *U. S.* 463, 63 *S. Ct.* 1241, 87 *L. Ed.* 1519 (1943); *State v. DiRienzo,* 53 *N. J.* 360 (1969). *N. J. S. A.* 2A:81–12 is clearly founded on the "widespread belief that a conviction for crime has probative value with respect to credibility of a witness." *State v. Hawthorne, supra* at 145 (concurring opinion by Chief Justice Weintraub). We cannot say that the Legislature's finding of a nexus between conviction of a crime and credibility is unwarranted. In *State v. Harless,* 23 *Utah* 2d 128, 459 *P.* 2d 210 (1969), the Supreme Court of Utah dealt cogently with the problem. There it was noted that admission of prior conviction evidence "derives from the idea that there is a basis in reason and experience why one may place more credence in the testimony of one who has lived within the rules of society and the discipline of the law than in that of one who has so demonstrated antisocial tendency as to be involved in and convicted of serious crime. * * * [I]t hardly seems fair to suppress such facts and let him testify with the same credit as one who has led a more blameless life." *Id.* at 130, 459 *P.* 2d at 211. We agree with the above statement. Of course, the trial judge, as here, must carefully explain to the jury the limited purpose for which the evidence can be used. We conclude that the use of defendant's prior criminal record by the State did not infringe on defendant's rights.

## II

Defendant next contends that his right to be presumed innocent was unconstitutionally diluted by remarks

in the State's summation and trial court's charge that the jury could consider the defendant's interest in the outcome of the case when adjudging his credibility. We disagree. It is well settled that when a defendant takes the witness stand in a criminal case, he puts his character in issue and it is proper for the State and the trial judge to call attention to his interest in the result. *E. g., State v. Randall*, 95 *N. J. L.* 452, 454 (E. & A. 1921); *State v. Smith*, 100 *N. J. Super.* 420, 426 (App. Div. 1968). Moreover, it should be pointed out that in the present case the trial court did not even emphasize defendant's interest in the outcome of the case. Its instruction applied to all witnesses and did not single out the defendant.

### III

▮ We also reject defendant's contention that the first two arguments taken together require reversal. We can see no merit in the arguments individually or in combination.

### IV

Defendant next contends that the trial court committed reversible error in allowing testimony regarding the apprehension and identification of Wilson. He argues that such testimony was inadmissible because the events testified to occurred after the shootings and hence were not in furtherance of any common purpose. In particular, defendant objects to testimony relating to Wilson's apprehension, testimony of his identification at the hospital, testimony of his head injury, testimony regarding the origin of the glass in his head and clothes, and the introduction into evidence of his coat.

▮ Defendant contends that the alleged concerted action ended after the shootings or at least after Wilson's arrest, and that therefore any evidence relating to Wilson after those events was inadmissible against Sinclair. Of course, the acts of a co-actor in furtherance of the common plan are

admissible in evidence against any other co-actor once the State establishes that several persons have acted in concert in the commission of a crime as it did here.. *State v. Carbone,* 10 *N. J.* 329, 339–340 (1952). Subject to certain exceptions, the acts of an alleged co-conspirator are generally not binding on another once the conspiracy ends. See *Logan v. United States,* 144 *U. S.* 263, 12 *S. Ct.* 617, 36 *L. Ed.* 429 (1892) ; see generally 3 *Underhill, Criminal Evidence* § 864 (5th ed. 1957). In the present case most of the evidence relating to Wilson at the time of and after his arrest consisted of physical exhibits which buttressed Friedman's testimony of the conspiracy to rob. Friedman had testified that two men had attempted to hold up his store and that one of them had shot his wife and a customer, that he had broken a bottle on one's [Wilson's] head, and that the latter had fled. Evidence that Wilson's head was bleeding when he was apprehended, that he had glass slivers in his head and on his clothes, was corroborative of Friedman's testimony. In addition, the coat worn by Wilson was corroborative of Friedman's description of him as was Friedman's identification of Wilson. The only evidence which could possibly be considered as a post-conspiracy act of Wilson was his staggering on the street with his head bleeding. We think this evidence was admissible to lend credence to Friedman's testimony that he hit his assailant on the head with a bottle. *Lutwak v. United States,* 344 *U. S.* 604, 73 *S. Ct.* 481, 97 *L. Ed.* 593 (1952) ; *Abbate v. United States,* 247 *F.* 2d 410 (5th Cir. 1957). The remainder of the evidence, although gathered after his arrest, did not concern post-conspiracy acts of Wilson, but rather was evidence of events which occurred during the alleged concerted action and supported the State's theory that Sinclair and Wilson acted together in committing the crimes in Friedman's store.

V

Sinclair next contends that the trial court improperly admitted into evidence the knife found on him. During

cross examination the State attempted to cast doubt on the defendant's explanation for disposing of the murder weapon just before his arrest. Later, it introduced the knife into evidence. As previously mentioned, the defendant maintained that Wilson had given him the gun and that he had disposed of it only because he was aware that it was against the law to carry a gun. The State introduced a knife which had been found on the defendant's person at the time of his arrest and obtained from him an admission that he also knew possession of the knife was illegal yet had not disposed of it. There is no question but that the State had the right to point out to the jury the inconsistency in the conduct of the accused in disposing of the gun and not the knife. While we do not believe that the introduction of the knife into evidence was necessary and do not encourage the placing of such peripheral evidence before the jury, we cannot say the trial court misused its discretion or that the rights of the defendant were in any way prejudiced. The jury was fully aware that the knife was in no way related to the crimes for which the defendant was charged. We are satisfied that the introduction of the knife as an exhibit could not have affected the verdict. See *State v. Rusnak*, 108 *N. J. L.* 84, 88–89 (E. & A. 1931).

## VI

Defendant urges for the first time on this appeal that his out-of-court identification by Friedman was conducted under circumstances which denied him his right to due process of law.[1] It should be pointed out defendant's

---

[1]Defendant was not represented by counsel when Friedman saw him for pre-trial identification. The United States Supreme Court has held that a post-indictment viewing of an accused by a witness arranged by the police to determine identification is a "critical stage" at which the accused has a sixth amendment right to be represented by counsel. *United States v. Wade*, 388 *U. S.* 218, 87 S. Ct. 1926, 18

failure to object below was apparently based on our resolution of this issue in his appeal from his first conviction. *State v. Sinclair, supra,* 49 *N. J.* at 544–546. There we said:

In the present case Friedman had ample opportunity to observe the two men who committed the crimes in his store, and he identified both defendants within a few hours after the crimes when the events and recollections were still fresh in his memory. See *State v. Matlack, supra,* 49 N. J., at p. 491. Moreover, Friedman before seeing Sinclair although after seeing Wilson picked out their photographs from among those of eight or ten other persons. We are satisfied that these identifications were made under circumstances which precluded unfairness and unreliability. *Id.* at 545–546.

Defendant has not presented any new arguments on this point and we see no reason to change the view expressed in *Sinclair, supra.*

## VII

▉ Defendant attacks the trial court's instruction to the jury regarding the possibility of parole if life imprisonment were recommended. This objection, not raised below, is based on the thesis that the instruction deprived the defendant of a fair consideration by the jury of a life sentence. The argument is without merit. The trial court's instruction was substantially identical with the model charge set forth in *State v. White,* 27 *N. J.* 158, 179 (1958). Moreover, we rejected this same argument in defendant's appeal from his first conviction. 49 *N. J.* at 447–448. Accordingly, there is no merit to this point.

---

*L. Ed.* 2d 1149 (1967) and *Gilbert v. California,* 388 *U. S.* 263, 87 S. Ct. 1951, 18 *L. Ed.* 2d 1178 (1967). However, the same day it was held that *Wade* and *Gilbert* were not retroactive and applied only to identifications made after June 12, 1967. *Stovall v. Denno,* 388 *U. S.* 293, 87 *S. Ct.* 1967, 18 *L. Ed.* 2d 1199 (1967). Defendant in the present case is not entitled to assert the *Wade* and *Gilbert* exclusionary rule since his identification was made on October 24, 1964.

## VIII

Defendant argues that the exclusion of two veniremen for cause by reason of their position on capital punishment denied him a representative jury guaranteed by the sixth and fourteenth Amendments.

During the voir dire 118 prospective jurors were examined: four were excused for cause on grounds unrelated to capital punishment; 41 were excused by consent; 29 were challenged peremptorily, 19 by the defense and 10 by the State; 30 were successfully challenged for cause on the issue of capital punishment. The defendant attacks the exclusion of two of 30 veniremen excused for cause on the issue of capital punishment. When first questioned venireman Kerr thought he could impose the death penalty in a given case. Under subsequent questioning, he equivocated and ultimately stated that, since he would be given the option between the death penalty and life imprisonment, he would always vote for life imprisonment. Venireman Greene was even more equivocal. Initially he said he was "not certain" that he "believed in the death penalty." In his view it would be more "practical" to put a murderer "to hard useful labor for the rest of his life" and that he would lean in all cases toward recommending life imprisonment. Later he indicated that he did not think his mind was "completely closed to the matter of capital punishment." Both Kerr and Greene were excused for cause by the trial judge.

As we said in *State v. Wilson,* 57 *N. J.* 39 (1970), decided today, a venireman must be able to affirmatively say whether he could vote for the death penalty where the circumstances warranted it. *Id.* at 54. See also *State v. Artis,* 57 *N. J.* 24 (1970); *State v. Mathis,* 52 *N. J.* 238 (1968). In the present case Kerr was clearly excusable for cause under criteria set forth in *Witherspoon v. Illinois,* 391 *U. S.* 510, 88 *S. Ct.* 1770, 20 *L. Ed.* 2d 776 (1968). Although his first responses were unclear, he ultimately

indicated that, given the option, he would always vote for life imprisonment. Greene, on the other hand, was equivocal throughout the questioning, probably because he had not resolved the matter in his own mind. We agree with the trial court's determination that the State was entitled to more than a juror who is uncertain whether he could vote for the death penalty. *State v. Mathis, supra* at 248. In any event, we are satisfied from our examination of the record that the trial judge correctly understood the principles of *Witherspoon, supra,* and even if one or two jurors were erroneously excluded, which we do not believe, there is no prejudice where, as here, the jury ultimately selected was representative in character. *State v. Mathis, supra* at 249–251.

## IX

Finally, defendant attacks the imposition of the death penalty on the same grounds advanced in *State v. Wilson, supra* at 55 of 57 *N. J.* For the reasons we have stated there, we think judgment should be withheld until the United States Supreme Court acts on these questions.

## X

The judgment of the trial court is affirmed but entry of the judgment is to be withheld until further order of this Court.

*For affirmance but withholding entry of judgment*—Chief Justice WEINTRAUB *and* Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN—7.

*For reversal*—None.