NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0850-18T3

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

TYWAUN S. HEDGESPETH, a/k/a
TYWAUNE HEDGESPETH,
TYWUAN HEDGESPETH,
TYWAUN HEDGSPETH, and
TAVON JAMES,

    Defendant-Appellant.

_____

APPROVED FOR PUBLICATION
AS REDACTED
August 3, 2020

APPELLATE DIVISION

Argued telephonically April 1, 2020 –
Decided August 3, 2020

Before Judges Whipple, Gooden Brown, and Mawla.

On appeal from the Superior Court of New Jersey,
Law Division, Essex County, Indictment Nos. 16-07-
2215 and 16-07-2216.

Whitney Faith Flanagan, Assistant Deputy Public
Defender, argued the cause for appellant (Joseph E.
Krakora, Public Defender, attorney; Whitney Faith
Flanagan, of counsel and on the briefs).

Lucille M. Rosano, Special Deputy Attorney General/
Acting Assistant Prosecutor, argued the cause for
respondent (Theodore Stephens II, Acting Essex

County Prosecutor, attorney; Lucille M. Rosano, of counsel and on the brief).

The opinion of the court was delivered by

GOODEN BROWN, J.A.D.

Following a jury trial, defendant was convicted of third-degree possession of a controlled dangerous substance, N.J.S.A. 2C:35-l0(a); and second-degree possession of a handgun without a permit, N.J.S.A. 2C:39-5(b). He subsequently pled guilty to second-degree certain persons not to have weapons, N.J.S.A. 2C:39-7(b)(1). The convictions stemmed from officers observing the butt of a handgun in defendant's waistband when he urinated in an alleyway, as a result of which they searched him and recovered the gun. During the ensuing search incident to his arrest, the officers also found cocaine on defendant's person. Defendant's pre-trial motion to suppress the evidence seized was denied.

On December 1, 2017, defendant was sentenced to an aggregate term of eight years' imprisonment with a five-year period of parole ineligibility. He now appeals from the conforming judgment of conviction, raising the following points for our consideration:

> POINT I
>
> THE ERRONEOUS ADMISSION OF [DEFENDANT]'S TWELVE-YEAR-OLD PRIOR

2

CONVICTIONS FOR THIRD[-]DEGREE OFFENSES REQUIRES REVERSAL.

POINT II

THE CONVICTION SHOULD BE REVERSED BECAUSE THE TRIAL COURT FAILED TO ESTABLISH THAT JUROR RACIAL BIAS DID NOT PREJUDICE DELIBERATIONS.

POINT III

THE ADMISSION OF AN AFFIDAVIT SIGNED BY A NON-TESTIFYING POLICE OFFICER VIOLATED THE RULES OF EVIDENCE AND THE CONFRONTATION CLAUSE OF THE NEW JERSEY AND FEDERAL CONSTITUTIONS.

POINT IV

THE MOTION COURT ERRED IN DENYING SUPPRESSION WITHOUT A HEARING WHEN THERE WERE MATERIAL FACTUAL [DIFFERENCES] BETWEEN THE STATE AND DEFENSE VERSIONS OF THE EVENTS LEADING TO [DEFENDANT]'S ARREST AND SEARCH.

POINT V

THE CUMULATIVE EFFECT OF THE AFOREMENTIONED ERRORS DENIED DEFENDANT A FAIR TRIAL. (NOT RAISED BELOW).

Having considered the arguments and applicable law, we affirm.

3

I.

We glean these facts from the trial record. At approximately 12:00 p.m. on April 21, 2016, while conducting visual surveillance in the area of 310 South 14th Avenue in Newark, "a mixture of residential homes" and "commercial establishments," Detectives Ozzie Ryals and Ricardo Rickards of the Essex County Sheriff's Narcotics Bureau observed "four to six unidentified [B]lack males . . . loitering and lingering" in the area. Ryals testified they were conducting surveillance because they "had received numerous complaints from concerned citizens about narcotic[s] activity at that particular location." Subsequently, the unidentified individuals were joined by an individual later identified as defendant. When defendant "urinat[ed] on the wall" in "an alleyway . . . between . . . two buildings," and "was fixing himself and adjusting his clothes," the officers observed what they "thought [was] the butt of a gun" located in the "waistband of [defendant's] pants."

Ryals communicated his observations to back-up officers in the area, including a description of defendant's "approximate height[,] . . . weight," and "clothing." At approximately 2:00 p.m., at least nine detectives, including Detectives Angel Colon and Jimmy Bradley, responded to the area. Upon approaching defendant and identifying himself as a law enforcement officer, Bradley "grabbed . . . [d]efendant, [and] took him to the ground face down," at

which point both Bradley and Colon observed a gun in "the rear of [defendant's] waistband."

After Colon "recovered the weapon," identified as "a Hi-Point .45 caliber handgun," another detective "read . . . [d]efendant his rights and placed him under arrest." A search of defendant's person incident to his arrest uncovered fourteen "small Ziploc bags" of suspected cocaine in defendant's "front waistband." Later testing by a New Jersey State Police (NJSP) forensic scientist confirmed that the substance recovered from defendant was cocaine, and ballistics testing by a detective confirmed that the handgun was operable. The handgun, as well as the magazine and nine rounds of ammunition recovered from it, were also processed for fingerprints by a crime scene investigator (CSI) with negative results.

During the three-day trial conducted from August 8 to 10, 2017, in addition to Ryals, Colon, the forensic scientist, the ballistics detective, and the CSI testifying for the State,[1] the Essex County Superior Court Criminal Division Manager authenticated "a certification of no gun permit," which attested to the fact that her office "searched [the county's] systems" and "found

---

[1] An Essex County Sheriff's Officer assigned to the jail also testified for the State, and confirmed that defendant's clothing at the time of his arrest was "inventoried as part of the processing procedures . . . at the jail," and "subsequently turned over to the [Essex County Prosecutor's Office (ECPO)]."

no record [of] gun permits for [defendant]." Additionally, Detective John Cosgrove, assigned to the Trial Section of the ECPO, authenticated an "affidavit" prepared by NJSP Detective Brett Bloom, certifying that the NJSP performed a record check and determined defendant "[did] not have a permit to carry a firearm on record with the State."

Cosgrove explained in detail the procedure for obtaining record checks from the NJSP and testified he had requested approximately one thousand similar record checks during his career. Cosgrove also stated that although he did "not know which particular trooper did the search," the affidavit in this case was requested by an investigative aide in his unit. Further, Cosgrove explained that the difference between the NJSP affidavit and the county affidavit was the former "searche[d] the State database," while the latter only "search[ed] the County database."

After the State rested, defendant's motion for a judgment of acquittal, R. 3:18-1, was denied by the trial judge, as was defendant's objection to admitting his prior convictions for impeachment purposes if he elected to testify pursuant to State v. Sands, 76 N.J. 127 (1978), and State v. Brunson, 132 N.J. 377 (1993). Thereafter, defendant did not testify or present any witnesses on his own behalf, but, through cross-examination, challenged the State's version of events by, among other things, pointing out that there were no

contemporaneous central dispatch recordings referring to a man with a gun to corroborate the detectives' account.[2] After the jury returned the guilty verdict, defendant entered a negotiated guilty plea to the certain persons charge stemming from the same incident but charged in a separate indictment. This appeal followed.

## II.

In Point I, defendant argues the judge "mistakenly ruled that the prosecutor could use his prior convictions to impeach him" if he elected to testify by erroneously using "the date that [defendant] completed probation," instead of "the date that [he] was convicted of the prior offense," as "the triggering date for the remoteness determination." According to defendant, "[t]his was an incorrect interpretation of the rule, . . . infringed [defendant's] due process right to testify and deprived him of a fair trial."

At the <u>Sands</u>/<u>Brunson</u> hearing, pursuant to N.J.R.E. 609, the State moved to introduce for impeachment purposes defendant's two prior drug-related

---

[2] Ryals testified there were three different ways to communicate with other officers, "recorded" radio calls on the central dispatch channel, unrecorded calls on a "direct" channel that only "detectives assigned to the Narcotic[s] Unit" could hear, and "cellphone" calls between the detectives if there was "too much radio chatter." According to Ryals, because "both [he and Rickards] were relaying information" to the back-up officers simultaneously, one of them "us[ed] one channel," and "the other . . . us[ed] the other [channel]."

convictions, a 2001 third-degree conviction for which defendant was sentenced to a three-year term of imprisonment with a one-year parole disqualifier,[3] and a 2005 third-degree conviction for which defendant was sentenced to four years' probation. The State argued that the 2005 conviction was "not remote" because the probationary disposition "ended in 2009 which [was] less than ten years ago," and the 2001 conviction was admissible based on the 2005 conviction showing a continuing course of criminal conduct. Defendant objected, arguing that the convictions were "so remote" that there was "no reason for [defendant] to be prejudiced by something that he did more than [twelve] years ago."

The judge accepted the State's argument and admitted the prior convictions for impeachment purposes, reasoning that they were not "too remote[] as there ha[d] been a continuing course of conduct." See Sands, 76 N.J. at 145 ("If a person has been convicted of a series of crimes through the years, then conviction of the earliest crime, although committed many years before, as well as intervening convictions, should be admissible."). However, the judge determined that the prior convictions "should be sanitized" since they were also drug related charges. See Brunson, 132 N.J. at 391 (holding

---

[3] The 2001 conviction encompassed two different third-degree drug offenses charged in two separate accusations, for which defendant received an aggregate three-year term of imprisonment with a one-year parole disqualifier.

A-0850-18T3

that in cases in which a testifying defendant's prior conviction "is the same or similar to the offense charged, the State may introduce evidence of the defendant's prior conviction limited to the degree of the crime and the date of the offense but excluding any evidence of the specific crime of which defendant was convicted.").

"[W]hether a prior conviction may be admitted into evidence against a criminal defendant rests within the sound discretion of the trial judge," Sands, 76 N.J. at 144, "whose discretion 'is a broad one.'" State v. Murphy, 412 N.J. Super. 553, 564 (App. Div. 2010) (quoting Sands, 76 N.J. at 144). "However, we do not defer to a ruling that is based on a mistaken interpretation of an evidence rule, or that misapplies the rule." State v. R.J.M., 453 N.J. Super. 261, 266 (App. Div. 2018).

"Under N.J.R.E. 609, there are different standards for admissibility of a prior criminal conviction for impeachment purposes, depending on whether 'more than ten years have passed' since the defendant's conviction 'or release from confinement for it, whichever is later.'" Id. at 263-64, 267 (quoting N.J.R.E. 609(b)(1)). "Pursuant to N.J.R.E. 609(a), a defendant's prior criminal conviction is admissible for impeachment purposes, unless the defense establishes, pursuant to N.J.R.E. 403, that its admission will be substantially more prejudicial than probative." Id. at 266; see N.J.R.E. 609(a). "However,

N.J.R.E. 609(b)(1) creates a presumption that a conviction more remote than ten years is inadmissible for impeachment purposes, unless the State carries the burden of proving 'that its probative value outweighs its prejudicial effect.'" R.J.M., 453 N.J. Super. at 266-67 (quoting N.J.R.E. 609(b)(1)).

Specifically, pursuant to N.J.R.E. 609(b)(1),

> [i]f, on the date the trial begins, more than ten years have passed since the witness'[s] conviction for a crime or release from confinement for it, whichever is later, then evidence of the conviction is admissible only if the court determines that its probative value outweighs its prejudicial effect, with the proponent of that evidence having the burden of proof.

In making that determination, pursuant to N.J.R.E. 609(b)(2), "the court may consider"

> (i) whether there are intervening convictions for crimes or offenses, and if so, the number, nature, and seriousness of those crimes or offenses,
>
> (ii) whether the conviction involved a crime of dishonesty, lack of veracity or fraud,
>
> (iii) how remote the conviction is in time,
>
> (iv) the seriousness of the crime.
>
> [N.J.R.E. 609(b)(2)(i) to (iv).]

"However, making findings as to those four factors is not enough. The court must then engage in the weighing process under (b)(1), to determine whether the State has carried its burden of proving that evidence of the remote

conviction would not be more prejudicial than probative."  R.J.M., 453 N.J. Super. at 270 (citing N.J.R.E. 609(b)(1)).  Thus, N.J.R.E. 609(b)(1) encompasses a more stringent admissibility standard, when more than ten years have passed since the "conviction" or the defendant's "release from confinement for it," than N.J.R.E. 609(a), applicable when ten years or less have passed.

Because "confinement" is not defined in the rule, whether discharge from probation constitutes "release from confinement" for the purpose of the ten-year time limit under N.J.R.E. 609(b)(1) is an issue of first impression in this State.  "We interpret an evidence rule, as we would a statute, by first looking at its plain language."  R.J.M., 453 N.J. Super. at 267 (quoting State ex rel. J.A., 195 N.J. 324, 338 (2008)).  "We give 'the terms used . . . their ordinary and accepted meaning,' and we construe the words in the context in which they appear."  Ibid. (quoting State v. Shelley, 205 N.J. 320, 323 (2011)); see also N.J.S.A. 1:1-1; State v. Regis, 208 N.J. 439, 447 (2011).

"Where the meaning is evident from the plain language, we need not look further in interpreting the rule."  R.J.M., 453 N.J. Super. at 269; see also State v. Rangel, 213 N.J. 500, 509 (2013) ("If giving an enactment's words their commonsense and ordinary meaning reveals legislative intent, our mission is complete."); DiProspero v. Penn, 183 N.J. 477, 492 (2005) ("The

Legislature's intent is the paramount goal when interpreting a statute and, generally, the best indicator of that intent is the statutory language."). However, if the "words 'admit[] to more than one reasonable interpretation,' we consider external sources in attempting to 'ascertain . . . intent.'" State v. Clarity, 454 N.J. Super. 603, 607 (App. Div. 2018) (first alteration in original) (quoting State v. Reiner, 180 N.J. 307, 311 (2004)).

In Clarity, on which defendant heavily relies, we considered whether a "probationary term imposed for [a defendant's] last prior crime [w]as the equivalent of 'confinement'" under N.J.S.A. 2C:44-3(a), permitting "imposition of an extended prison term when the defendant was convicted of at least two separate prior crimes but only if 'the latest' of those crimes was committed or the defendant's 'last release from confinement' occurred—'whichever is later'—within ten years of the charged crime." 454 N.J. Super. at 606, 608. We held that "an individual serving a probationary term cannot be considered to be confined within the meaning of N.J.S.A. 2C:44-3(a)," id. at 611 (footnote omitted), because "[b]eing on probation is not the same as being 'confine[d]' within the meaning of N.J.S.A. 2C:44-3(a)." Id. at 609 (second alteration in original).

Acknowledging that "the Legislature did not define the word 'confinement,'" we applied "its 'generally accepted meaning,'" and concluded

that "[t]he Legislature undoubtedly meant that 'confinement' would not occur unless the defendant had been deprived of his freedom by governmental authorities." Id. at 609-10.

> The reason for this interpretation seems obvious. The statute was intended to create the judicial discretion to impose an extended term on an individual incapable of living a law-abiding life for a significant period of time. Our Legislature fixed that period of time at ten years, thus conveying that an individual who is capable of residing in our communities for more than ten years without committing a crime should not be treated as a persistent offender. The portion of the statute that views that ten-year period as commencing from the individual's release from "confinement" simply deprives that individual of the ability to illogically argue a preceding ten-year crime-free life when that individual was only able to remain crime-free because of imprisonment.[4] An individual on probation, while living with some limitations, is out in society and remains capable of committing a crime. Remaining crime free during the preceding ten years—even when serving a probationary term during part or all of that ten years—demonstrates that individual's ability to lead the ten-year crime-free life anticipated by our Legislature when enacting N.J.S.A. 2C:44-3(a).

---

[4] On the other hand, the underlying rationale for N.J.R.E. 609 is the belief that a person who has lived contrary to "the rules of society and the discipline of the law" by committing crimes should not be able to shield his or her credibility from the jury and present himself or herself as a law-abiding individual. State v. Sinclair, 57 N.J. 56, 64 (1970) (quoting State v. Harless 459 P.2d 210, 211 (1969)); see also Sands, 76 N.J. at 145 ("A jury has the right to weigh whether one who repeatedly refuses to comply with society's rules is more likely to ignore the oath requiring veracity on the witness stand than a law abiding citizen.").

[Id. at 610.]

In State v. Boykins, the issue was whether the defendant, who received a second extended-term sentence for a crime he committed "while he was on probation and out on bail awaiting trial" on the offense for which he received his first extended-term sentence, "was 'in custody' within the meaning of [N.J.S.A.] 2C:44-5(b) when he committed the second offense" and "thus not subject to the statute's prohibition against multiple extended terms." 447 N.J. Super. 213, 214-15, 217-18, 223 (App. Div. 2016). We concluded defendant committed the second offense "while he was 'in custody' as that term was understood by the drafters of [N.J.S.A.] 2C:44-5(b), and therefore that his second extended-term sentence was not illegal." Id. at 217-18.

Unlike Clarity, in Boykins, we rejected the defendant's argument that being "on probation or on bail" is "contrary to the . . . conventional meaning" of the term being "'in custody.'" Id. at 220 (quoting N.J.S.A. 2C:44-5(b)). We explained that "[a]lthough there [was] no disputing that [a] defendant would not be entitled to jail credit for the time he spent on probation or on bail prior to his trial" pursuant to Rule 3:21-8, "[j]ust because the phrase 'in custody' appears in both N.J.S.A. 2C:44-5(b) and in Rule 3:21-8 does not mean it means the same thing in both texts." Boykins, 447 N.J. Super. at 220; see State v. DiCarlo, 67 N.J. 321, 325 (1975) (noting "the adventitious occurrence

14

of like or similar phrases, or even of similar subject matter, in laws enacted for wholly different ends will normally not justify applying the rule" of in pari materia as an aid in statutory construction).

More to the point, in R.J.M., we considered the definition of confinement in relation to N.J.R.E. 609, but in a different context. There, the issue was "whether the time period during which a defendant has been civilly committed pursuant to the Sexually Violent Predator Act (SVPA), N.J.S.A. 30:4-27.24 to -27.38, must be included in determining the ten-year time period" for purposes of N.J.R.E. 609(b)(1). 453 N.J. Super. at 264. "We h[e]ld that because civil commitment is not confinement 'for' the crime of which a defendant was convicted, the period of civil commitment must be included in determining the ten-year time period." Ibid. We noted that "[t]aken in context, 'confined' clearly refers to the custodial portion of a defendant's criminal sentence, and is not a more general reference to any deprivation of physical liberty." Id. at 269.

Federal courts have consistently held that "confinement" in Rule 609(b) of the Federal Rules of Evidence does not include periods of probation. See Fed. Rules Evid. 609(b) (providing that "if more than [ten] years have passed since the witness's conviction or release from confinement for it, whichever is later," evidence of the conviction is only admissible if "its probative value . . .

substantially outweighs its prejudicial effect; and . . . the proponent gives an adverse party reasonable written notice of the intent to use it so that the party has a fair opportunity to contest its use").  Although N.J.R.E. 609 "departs significantly from its federal analog," because a "conviction or release from confinement for it," appears in both rules as the starting point for the calculation of the ten-year time period, the federal courts' interpretation of confinement is instructive.  State v. Harris, 209 N.J. 431, 442, 444 (2012).

In United States v. Stoltz, the court held consistent with "[its] sister circuits" that "'confinement' for purposes of the ten-year time limit in Rule 609(b) does not include periods of probation."  683 F.3d 934, 939 (8th Cir. 2012) (quoting United States v. Rogers, 542 F.3d 197, 201 (7th Cir. 2008)).  "Rather, Rule 609(b)'s '[ten-year] clock starts at the witness's release from any physical confinement, or in the absence of confinement, the date of the conviction.'"  Ibid. (alteration in original) (quoting Rogers, 542 F.3d at 201).  In Rogers, the court specified "Rule 609(b) unambiguously starts the clock at the date of conviction or release from 'confinement,' without any mention of periods of probation or parole."  542 F.3d at 200.

In United States v. Daniel, where the court also concluded that "'confinement' excludes probationary periods," 957 F.2d 162, 168 n.4 (5th Cir. 1992), to support its decision, the court pointed to "the change in the language

A-0850-18T3

of the rule" from the pre-1972 language "that the ten-year period should run from 'the expiration of the period of . . . parole, probation, or sentence,'" to the current amended language "that a conviction is not admissible if more than ten years have elapsed since 'release from confinement.'"  Id. at 168.  The court determined "[t]he change in the language . . . forecloses the interpretation [that release from confinement includes probation]."  Ibid.; see also United States v. Butch, 48 F. Supp. 2d 453, 465 (D.N.J. 1999) ("In calculating [609(b)'s] ten year period, the term 'release from confinement' does not include any period of probation or parole.").

Other states with rules similar to Rule 609(b) of the Federal Rules of Evidence have followed the lead of the federal courts and held that confinement does not include that portion of a sentence served while on probation.  See Allen v. State, 687 S.E.2d 799, 803 (Ga. 2010) (holding that "probation does not qualify as confinement" under Georgia's equivalent of Fed. Rules Evid. 609(b)); State v. Shands, 817 S.E.2d 524, 533 (S.C. Ct. App. 2018) ("[P]robation and parole do not constitute 'confinement' for the purposes of Rule 609(b); confinement ends when a defendant is released from actual imprisonment."); Commonwealth v. Treadwell, 911 A.2d 987, 991 (Pa. Super. Ct. 2006) ("[W]e agree with the federal courts and our sister states, and conclude that probation does not qualify as confinement under Pennsylvania

17

Rule 609(b)," which "was modeled after and differs only slightly from Federal Rule of Evidence 609(b)."); State v. Dunlap, 930 P.2d 518, 538 (Ariz. Ct. App. 1996) (holding that "probation is not confinement and does not extend the time for measuring the ten-year period" of Arizona's Rule 609(b), which "source" is "the federal rule").

We are persuaded that the plain language of N.J.R.E. 609, coupled with the construction of identical language by the federal courts and sister states, as well as our prior interpretation of confinement in both related and unrelated contexts lead us to conclude that probation does not qualify as confinement under N.J.R.E. 609(b)(1). As we stated in Clarity, the "generally accepted meaning [of confinement] requires that the confined individual be 'imprisoned or restrained,' 'deprive[d] . . . of . . . liberty,' or 'place[d] in prison or jail.'" 454 N.J. Super. at 609 (alterations in original) (first quoting Black's Law Dictionary 362 (10th ed. 2014), then quoting Ballentine's Law Dictionary 244 (3d ed. 1969)). Although a defendant is not technically a free citizen while on probation, he or she is no longer confined or imprisoned as required under N.J.R.E. 609(b)(1).

Here, because more than ten years lapsed between defendant's 2005 conviction and his 2017 trial, and he was not confined while on probation for the 2005 conviction, both prior convictions were presumptively inadmissible

and the judge erred in ruling to the contrary.  Because the judge erroneously admitted the convictions under N.J.R.E. 609(a)'s less stringent standard, she did not consider the N.J.R.E. 609(b)(2) factors and did not analyze the admissibility of the prior convictions under N.J.R.E. 609(b)(1)'s more stringent standard.  Thus, we conclude the judge's evidentiary ruling constituted a mistaken exercise of discretion.

Next, we address whether the ruling was harmless error.  Rule 2:10-2 directs reviewing courts to disregard "[a]ny error or omission . . . unless it is of such a nature as to have been clearly capable of producing an unjust result."  "[T]hat rule 'requires that there be "some degree of possibility that [the error] led to an unjust result."'"  State v. Scott, 229 N.J. 469, 484 (2017) (alteration in original) (quoting State v. R.B., 183 N.J. 308, 330 (2005)).  "The possibility must be real, one sufficient to raise a reasonable doubt as to whether [it] led the jury to a verdict it otherwise might not have reached."  R.B., 183 N.J. at 330 (alteration in original).

While the "[e]xclusion of testimony, . . . which is central to a defendant's claim or defense, 'if otherwise admissible, cannot be held to be harmless error,'" when it comes to a defendant's testimony, "we look to evidence outside of defendant's testimony because it is the 'sort of evidence that a jury naturally would tend to discount as self-serving.'"  Scott, 229 N.J. at 484 (quoting

<u>Skipper v. South Carolina</u>, 476 U.S. 1, 8 (1986)). Thus, under this standard, if the evidence is strong, and a limiting instruction is given to mitigate the error, the error may be harmless.

Here, defendant understandably declined to testify in light of the judge's ruling that if he did so, the State could impeach him with his prior convictions. However, the State's evidence was so strong that had defendant testified, there was no real possibility that the jury would have reached a different result. While defendant challenged the detectives' credibility, particularly whether they actually observed a handgun in his waistband, their credibility was corroborated by the fact that a handgun was, in fact, recovered from that precise location.

Further, at defendant's request, the judge instructed the jury that it may not draw any inferences adverse to defendant on the basis of his failure to testify. <u>See</u> <u>State v. Haley</u>, 295 N.J. Super. 471, 475 (App. Div. 1996) (holding that the trial judge's failure to instruct the jury that it may not draw an adverse inference from a defendant's exercise of the right not to testify is an error of constitutional magnitude which requires reversal of any resulting conviction). Thus, given the strength of the State's evidence and the limiting instruction provided by the judge, the erroneous evidentiary ruling was not of

20

"such a nature as to have been clearly capable of producing an unjust result." R. 2:10-2.

In Point III, defendant argues that his conviction for possession of a handgun without a permit should be reversed because the judge "erred in admitting the [NJSP no-permit] affidavit of a non-testifying witness" in violation of "both the New Jersey Rules of Evidence and [his] constitutional right to confrontation." According to defendant, because the affidavit "was created by a state trooper in response to a request by the [ECPO]," for "the express purpose of [defendant's] criminal prosecution," and "was signed by a state trooper who never testified," the "affidavit was . . . testimonial and not admissible without the signer's appearance as a witness."

Under N.J.S.A. 2C:39-5(b), the State was required to prove that defendant was "knowingly . . . in . . . possession [of a] handgun . . . without first having obtained a permit to carry the same." To meet the "no-permit" requirement, through the testimony of Detective Cosgrove, the State offered into evidence an affidavit with a raised seal, signed by NJSP Detective Brett Bloom of the NJSP Firearms Investigative Unit, notarized on August 1, 2017, and attesting to the fact that a search of the NJSP database revealed that there was no permit to carry a firearm issued to defendant on record with the State.

Defendant objected to the admission of the affidavit "without any witness or foundation."

The judge acknowledged that the affidavit constituted hearsay, but qualified for admission under N.J.R.E. 803(c)(7),[5] the exception permitting the admission of

> [e]vidence that a matter is not included in a . . . record kept in accordance with . . . [N.J.R.E.] 803(c)(6),[6] when offered to prove the . . . nonexistence of the matter, if the matter was of a kind of which a . . . record was regularly made and preserved, unless the sources of information or other circumstances indicate that the inference of . . . nonexistence is not trustworthy.

Additionally, notwithstanding the testimony of Detective Cosgrove, the judge admitted the affidavit under N.J.R.E. 902,[7] providing that "[e]xtrinsic evidence of authenticity as a condition precedent to admissibility is not

---

[5] We note that N.J.R.E. 803 has been amended since the trial.

[6] N.J.R.E. 803(c)(6) permits the admission of:

> [a] statement contained in a writing or other record . . . made at or near the time of observation by a person with actual knowledge or from information supplied by such a person, if the writing or other record was made in the regular course of business . . . unless the sources of information . . . indicate that it is not trustworthy.

[7] We note that N.J.R.E. 902 has also been amended since the trial.

required with respect to" a "document purporting to bear a signature affixed in an official capacity by an officer or employee of the State of New Jersey." N.J.R.E. 902(a); see also N.J.R.E. 902(k) (providing that "[a] writing asserting the absence of an official record" authenticated as prescribed under N.J.R.E. 902(a) is a valid self-authenticating document). The judge noted that the notarized affidavit bore the raised seal of a governmental agency and was signed by an officer of the NJSP acting in his official capacity as the supervisor of the Firearms Investigative Unit.

We review "evidentiary rulings" by a trial judge under an "abuse of discretion" standard. State v. Gorthy, 226 N.J. 516, 539 (2016). "Hearsay is not admissible except as provided by [the Rules of Evidence] or by other law." N.J.R.E. 802. Under our evidence rules, the "no-permit" affidavit constitutes hearsay and is therefore only admissible if an exception to the prohibition against hearsay applies. Applying these principles, we discern no abuse of discretion in the judge's application of the hearsay rules to the State's proffer of the "no-permit" affidavit. The affidavit was properly admitted under N.J.R.E. 803(c)(7) and N.J.R.E. 902(a) and (k). See State v. Rogers, 177 N.J. Super. 365, 375 (App. Div. 1981) (allowing an affidavit by a non-testifying officer of the NJSP Firearms Identification Unit indicating that there was no

record of issuance of, or application for, a permit by the defendant to "negate the existence of a permit.").

Having concluded that the affidavit is admissible under the hearsay rules, we must next "address whether [it is] testimonial and thus run[s] afoul of the Confrontation Clause's guarantee" as "embodied in either the federal or our State Constitutions."[8] State v. Sweet, 195 N.J. 357, 368, 374 (2007); U.S. Const. amend. VI; N.J. Const. art. I, ¶ 10. "[I]f it is, then the fact of admissibility for purposes of the exceptions to the hearsay rules is insufficient." State v. Chun, 194 N.J. 54, 138-39 (2008). "That is to say, if the evidence is testimonial, reliability as defined by the exceptions to the hearsay rules does not equate with, and cannot substitute for, confrontation through cross-examination." Id. at 139.

"Under the standard set forth in Crawford, a testimonial statement against a defendant by a non-testifying witness is inadmissible under the Confrontation Clause unless the witness is unavailable and the defendant had a prior opportunity to cross-examine him or her." Wilson, 227 N.J. at 545

---

[8] While defendant did not expressly make a Confrontation Clause objection to the affidavit in the trial court, a defendant is not "require[d] to specifically use the terms 'Confrontation Clause' or 'Sixth Amendment' or to refer to [Crawford v. Washington, 541 U.S. 36 (2004)] to preserve a Confrontation Clause challenge." State v. Wilson, 227 N.J. 534, 543 (2017). Thus, we find the substance of defendant's objection to be sufficient to raise a Confrontation Clause challenge.

(citing Crawford, 541 U.S. at 59). "The threshold issue is, thus, whether the proffered statement is 'testimonial' in nature." Ibid. In Crawford, the Court described the class of testimonial statements covered by the Confrontation Clause as follows:

> Various formulations of this core class of testimonial statements exist: [ex parte] in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially; extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions; statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.
>
> [541 U.S. at 51-52 (second alteration in original) (citations and internal quotation marks omitted).]

"Although the Crawford Court refrained from offering a 'comprehensive definition' of the term," Wilson, 227 N.J. at 545 (citing Crawford, 541 U.S. at 68), in Wilson, our Supreme Court "upheld the primary purpose test originally announced in [Davis v. Washington, 547 U.S. 813 (2006)] and developed in pre-[Williams v. Illinois, 567 U.S. 50 (2012)] case law." Wilson, 227 N.J. at 546. Under the primary purpose test, "the question is whether, in light of all the circumstances the 'primary purpose' of the evidence was to 'create an out-

of-court substitute for trial testimony.'" Id. at 547 (alterations omitted) (quoting Ohio v. Clark, 576 U.S. 237, 245 (2015)).

Although our courts have not applied the "primary purpose" test to a "no-permit" affidavit to date, the test has been applied in a variety of other contexts. In Wilson, the Court determined that "the map, prepared and adopted by a governmental entity" and used in the defendant's drug distribution related prosecution was not testimonial. 227 N.J. at 549. The Court acknowledged that the map was "used in criminal prosecutions and was created, in part, for that purpose." Id. at 551. Nonetheless, the Court explained that the map "does not conclusively establish . . . guilt," depicted "an objective measurement that require[d] no 'independent interpretation' of raw data," and "report[ed] a present fact." Id. at 550-51 (quoting State v. Roach, 219 N.J. 58, 81 (2014)).

Furthermore, the map did not "target a particular person" and "may exonerate a person charged with violating N.J.S.A. 2C:35-7.1(a)," prohibiting distribution of a controlled dangerous substance within 500 feet of a public park. Id. at 551.

> Importantly, the map was not created in response to a criminal event. The map was created years before the commission of any of the offenses alleged here. When the map was produced, there was no alleged crime committed by defendant. Nor was the map created to

> establish a fact relevant to an ongoing police investigation.
>
> Therefore, the map was not created for the primary purpose of "establish[ing] or prov[ing] past events potentially relevant to later criminal prosecution."
>
> [Ibid. (alterations in original) (quoting State v. Bass, 224 N.J. 285, 314 (2016)).]

See also Bass, 224 N.J. at 317 (finding an autopsy report that had been prepared by a medical examiner who was deceased at the time of the defendant's trial was testimonial because its primary purpose was "to establish facts for later use in the prosecution of [that] case"); Roach, 219 N.J. at 81 (finding that a DNA profile created by a State forensic scientist from machine-generated data that required "subjective analysis" and "independent interpretation" of the raw data was testimonial); State v. Michaels, 219 N.J. 1, 9, 44 (2014) (finding that a report signed by a supervisor at a private lab certifying that the defendant would have been unfit to drive based on the presence of illegal drugs in his blood was testimonial because its primary purpose was to serve as a "direct accusation against [the] defendant" in the ensuing vehicular homicide prosecution); Chun, 194 N.J. at 147 (finding the printout on which the Alcotest reports its readings measuring a person's blood alcohol level was not testimonial because the printout "reports a present, and not a past, piece of information or data," cannot be influenced by the Alcotest

operator, "and may as likely generate a result that exonerates the test subject as convicts him or her").

In Melendez-Diaz v. Massachusetts, the United States Supreme Court determined that documents attesting to the non-existence of a particular record (often referred to as Certificates of Nonexistence of a Record or CNRs) "fall within the 'core class of testimonial statements'" covered by the Confrontation Clause. 557 U.S. 305, 310 (2009). There, the documents at issue that were found to be testimonial consisted of notarized certificates prepared by State analysts "showing the results of the forensic analysis performed" on the substances seized from the defendant in his drug trafficking prosecution. Id. at 308.

We acknowledge a split among federal and state courts as to whether certain CNRs are testimonial and thereby subject to the Confrontation Clause. See, e.g., United States v. Burgos, 539 F.3d 641, 645 (7th Cir. 2008) (finding that "CNR[s] are nontestimonial business records not subject to the requirements of the Confrontation Clause under Crawford"); United States v. Urqhart, 469 F.3d 745, 748-49 (8th Cir. 2006) ("[L]ikening the CNR to a business record, we follow the lead of our sister circuits and hold that a CNR is nontestimonial evidence under Crawford."); United States v. Cervantes-Flores, 421 F.3d 825, 833-34 (9th Cir. 2005) (holding that the CNR, certifying

no record of consent to reenter the United States, belonged to a "class of records . . . kept in the ordinary course of the [agency's] activities, prior to and regardless of [the defendant's] prosecution," and was therefore nontestimonial evidence under Crawford notwithstanding the fact that the CNR was made "at the request of the prosecutor").  But cf. United States v. Orozco-Acosta, 607 F.3d 1156, 1164 (9th Cir. 2010) (holding that the CNR, certifying no record of consent for re-admission into the United States, was testimonial but the violation of the defendant's confrontation right caused by its admission was harmless error); United States v. Martinez-Rios, 595 F.3d 581, 586 (5th Cir. 2010) (holding that because the CNR, certifying no record of consent to reapply for admission to the United States, was "exclusively generated for use at trial" and was used to establish a "fact necessary to convict," it was testimonial and triggered the Confrontation Clause); Tabaka v. District of Columbia, 976 A.2d 173, 175-76 (D.C. Cir. 2009) (holding that the CNR generated by a Department of Motor Vehicle official, certifying no record of an operator's permit having been issued to the defendant, was testimonial and improperly admitted without the testimony of the affiant in the defendant's drunk driving related prosecution); Washington v. State, 18 So. 3d 1221, 1223-25 (Fla. Dist. Ct. App. 2009) (holding that the CNR prepared by a State Licensing Board employee, certifying no contractor's license had been issued

to the defendant, was testimonial and its admission in the defendant's prosecution for acting as an unlicensed contractor violated the Confrontation Clause but "was harmless given the other evidence").

We find the analysis used by the Virginia appellate court in <u>Harris v. Commonwealth</u>, 673 S.E.2d 483 (Va. App. 2009) instructive. There, the defendant was convicted of failure to re-register as a sex offender. <u>Id.</u> at 484. On appeal, he argued the trial court violated the Confrontation Clause by admitting an affidavit prepared by the "custodian of the records for the Virginia State Police Sex Offender Registry" attesting to the fact that their records showed no sex offender registration form on file for the defendant during the relevant time period. <u>Ibid.</u>

In concluding that the affidavit was not testimonial in nature, the court explained

> the affidavit in question here is a document establishing the existence or absence of some objective fact, rather than detailing the criminal wrongdoing of the defendant. It was prepared in a non-adversarial setting, and is not accusatory. The affiant simply generated the document from objective facts already in existence. The sex offender registry is a neutral repository of information that reflects the objective results of a search of public records. The information contained in the affidavit simply summarizes the official registry of the Department of State Police . . . .

A-0850-18T3

[Id. at 487 (citations and internal quotation marks omitted).]

Likewise, here, the NJSP "no-permit" affidavit is not testimonial. The affidavit establishes the absence of an objective fact, rather than detailing the criminal wrongdoing of defendant. It is not accusatory in nature and is generated from facts already in existence. The information contained in the affidavit simply summarizes information in the NJSP's official database, which is a neutral repository for such information. Importantly, the database was not created in response to a criminal event, or to establish a fact relevant to an ongoing police investigation. It was created before any alleged crime by defendant, and could have just as easily generated a response that exonerated defendant. As in Harris, "while the affidavit may have been prepared with an eye towards litigation, the underlying records are not prepared in anticipation of litigation." Id. at 486. Because the affidavit is not testimonial, its admission without Bloom's testimony did not violate the Confrontation Clause.

> **[At this court's direction, Parts III, V, and VI of this opinion, which concern matters not pertinent to the admission of defendant's prior convictions for impeachment purposes, or the admission of the affidavit of a non-testifying police witness, have been omitted from the published version of this opinion. R. 1:36-3.]**

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

31